## * HORN v. COLE & A.

If the owner of goods, to prevent them from being attached as his own, represent that they belong to another, and the party to whom the representation is made, relying, and from the circumstances having reason to rely, on the representation as true, attach the goods for a debt due from the party, to whom it was represented that the goods belonged, in trover for attaching the goods, the owner will not be permitted to show that his representation was false, though at the time when he made it he had no notice of the debt on which the goods were attached, and had no intention to deceive the party who attached them.

TROVER, against Cole and Green, for feather-beds, crockery, glass ware, &c. It appeared on trial that the plaintiff was contemplating to remove West; that his son, Charles E. Horn, had removed before, and was residing at Jefferson, Illinois. The plaintiff packed a box of goods and delivered them to the freight agent at East Milan, directed to Charles E. Horn, Jefferson, Illinois, and ordered them to be forwarded by freight on the railroad. The box started from Milan in the freight cars on the 29th of August, 1864. The defendant Cole, having a note against Charles E. Horn, instituted a suit on it, and had the box and contents attached on the writ at Northumberland on the same 29th of August; and the defendant Green is the officer who made the attachment. The plaintiff brought this suit on the 31st of the same August. On the 3d of September he procured a receipter for the goods, and had them forwarded according to the orig-

---

* Decided July term, 1868, and furnished by Judge PERLEY to the reporter at this date (Dec , 1872), upon the written request of the whole court.

REPORTER.

inal direction. The suit of Cole against Charles E. Horn was settled by payment of debt and costs. The plaintiff, on his arrival at Jefferson, found the box and contents there in good condition. The plaintiff claimed damages for the detention of the goods, and for consequential damages.

The plaintiff testified that the goods all belonged to him when they were delivered to the railroad, and when they were attached.

The defendant Cole testified that the plaintiff, when carrying the box to the depot, passed by Cole's shop, and that he said to the plaintiff, "Are you going to leave us, Horn?" that Horn replied, "No; but Charles had some things at my house, and I took them, and put a few of my things with them into the box, and am sending them to Charles;" that the plaintiff then procured Cole to mark the box, as before stated. The evidence tended to show that the plaintiff made similar statements to others, before and after, as to the ownership of Charles E. Horn.

There was no evidence that the plaintiff knew Cole had any demand against Charles E. Horn.

The defendant Cole also testifies that, relying on this representation to him that the goods belonged to Charles E. Horn, he had procured his writ and caused the property to be attached as belonging to Charles E. Horn.

The plaintiff was not indebted to Cole, but there was evidence that he was indebted to others.

The jury returned a verdict for the defendants, which the plaintiff moves the court to set aside,—and contends that, in order that the plaintiff should be estopped by his statements to show that the goods were his, the statements must have been made with the knowledge that Cole had a debt against Charles E. Horn on which the goods might be attached; and that the plaintiff intended to deceive and defraud Cole.

*Fletcher*, for the plaintiff, cited *Andrews* v. *Lyons*, 11 Allen 349; *Coggill* v. *H. & N. H. Railroad*, 3 Gray 549; *Osgood* v. *Nichols*, 5 Gray 420; *Audenried* v. *Betteley*, 5 Allen 384; *Plumer* v. *Lord*, 9 Allen 455; *Langdon* v. *Doud*, 10 Allen 437.

*Ray*, for the defendants.

PERLEY, C. J. There is no complaint that the rulings and instructions of the court on the trial were erroneous or improper, provided the evidence warranted the jury in returning a verdict for the defendants; and the verdict must stand, if the evidence was competent to prove such representations by the plaintiff as would estop him to set up his title to the goods attached as the property of Charles E. Horn.

The evidence reported in the case was competent to prove that the plaintiff made the representations on the occasion and in the circumstances testified to by Cole; that the plaintiff, though not indebted to Cole, was in debt to others; that Cole, believing the representations to

be true, and relying on them as true, caused the goods to be attached as the property of Charles E. Horn; and, also, that the plaintiff made these representations, knowing them to be false, with the intention that all persons who were interested in the subject should take them to be true and act on them as such, and with the intention to mislead and deceive all to whom the representations were communicated, and induce them to act on them as true ; that his intention was to deceive his own creditors, and prevent them from taking the goods as his for the debts which he owed to them.    These facts must be taken to have been established by the verdict.

But, as there was no evidence that the plaintiff knew Cole had any demand against Charles E. Horn, we cannot infer that the plaintiff had Cole in his mind as an individual whom he meant to deceive by his false representations, or that he had an intent to prevent Cole from taking the goods for a debt which he owed to Cole, as he owed no such debt; and, on the evidence reported, the jury were not at liberty to find that the plaintiff had Cole in his mind as an individual whom he meant to deceive and defraud by inducing him to take the goods for his demand against Charles E. Horn.    This raises the point, which the counsel for the plaintiff takes, whether, to estop a party from showing that his representations were false, it is necessary that the false representations should have been intended to deceive and. defraud the individual party who trusted to them and acted on them, provided there was a general intention to deceive and defraud all persons who were interested in the subject-matter of the false representations.

The ground on which a party is precluded from proving that his representations on which another has acted were false is, that to permit it would be contrary to equity and good conscience.    This has been sometimes called an *equitable estoppel*, because the jurisdiction of enforcing this equity belonged originally and peculiarly to courts of equity, and does not appear to have been familiarly exercised at law until within a comparatively recent date ; and, so far as relates to suits at law affecting the title to land, I understand that in England and in some of the United States the jurisdiction is still confined to courts of equity.    *Storrs* v. *Barker*, 6 Johns. Ch. 166, 168 ; *Evans* v. *Bicknell*, 6 Ves. 174, 178 ; *Pickard* v. *Sears*, 6 Ad. & Ellis 469.    The doctrine, however, is a very old head of equity, and is recognized and applied in a great number of the early cases.    *Dyer* v. *Dyer*, 2 Ch. Cases 108 ; *Teasdale* v. *Teasdale*, 13 Viner 539 ; *Hobbs* v. *Norton*, 1 Vernon 136 ; *Gale* v. *Lindo*, 1 Vernon 475 ; *Hunsden* v. *Cheyney*, 2 Vernon 150 ; *Lamlee* v. *Hanman*, 2 Vernon 499 ; *Raw* v. *Pote*, 2 Vernon 239 ; *Blanchet* v. *Foster*, 2 Ves. 264 ; *East Ind. Co.* v. *Vincent*, 2 Atkins 83 ; *Stiles* v. *Cowper*, 3 Atkins 693 ; *Farmer* v. *Webber*, 13 Viner Abr. 525—2 Brown's Parl. Cases 88—2 Eq. Cases Abr. 481 ; *Neville* v. *Wilkinson*, 1 Bro. C. C. 543 ; *Storrs* v. *Barker*, 6 Johns. Ch. 166 ; *Strong* v. *Ellsworth*, 26 Vt. 366.

Many of these cases related to underhand agreements in fraud of

marriage settlements; but the principle is of general application. 1
Fonblanque Eq. 267, note (*x*).    Relief was given according to the
circumstances of the case,—sometimes by enjoining suits at law, in
which the legal title was set up, and sometimes by decreeing conveyan-
ces and the cancelling of deeds and other instruments; but in all these
cases relief was given in equity contrary to the strict legal rights of
the defendants.

Thus, in the case of an *equitable estoppel*, a party is not allowed to
assert his strict legal right, because, in the circumstances of the indi-
vidual case, it would be contrary to equity and good conscience.    Take
the present case for an illustration.    In trover, following the legal defi-
nition of the action, if the plaintiff proves property in himself and a
conversion by the defendant, he has maintained his action, and is en-
titled to a verdict and judgment.    It is conceded that the plaintiff
owned the goods, and that the defendants converted them.    The defence
here set up appeals from the strict rule at law to the equitable doctrine
*that a party shall not be allowed to exercise his legal right of prov-
ing the facts, if, on account of his previous declarations or conduct, it
would be contrary to equity and good conscience.    So in a writ of en-
try: by the technical rules at law, if the demandant proves seizin in
himself and a disseizin by the tenant within the time of limitation, he
is entitled to judgment; but if the demandant, having a dormant
title to the land demanded, concealed his title and encouraged the
tenant to purchase from another, he is not allowed in our practice to
set up his legal title, because it would be contrary to equity and good
conscience.

It thus appears that what has been called an equitable estoppel,
and sometimes with less propriety an *estoppel in pais*, is properly and
peculiarly a doctrine of equity, originally introduced there to prevent
a party from taking a dishonest and unconscientious advantage of his
strict legal rights,—though now with us, like many other doctrines of
equity, habitually administered at law.    But formerly the practice was
different, and suits at law, the courts being incapable of giving effect
to this equity, were often enjoined where the party insisted on his
rights at law contrary to the equitable doctrine, as in *Raw* v. *Pote*,
*Stiles* v. *Cowper*, and *Farmer* v. *Webber*, *qua supra*.

It would have a tendency to mislead us in the present inquiry, as there
is reason to suspect that it has sometimes misled others, if we should
confound this doctrine of equity with the *legal estoppel by matter in pais*.
The equitable estoppel and legal estoppel agree indeed in this, that
they both preclude from showing the truth in the individual case.    The
grounds, however, on which they do it are not only different, but di-
rectly opposite.    The legal estoppel shuts out the truth, and also the
equity and justice of the individual case, on account of the supposed
paramount importance of rigorously enforcing a certain and unvarying
maxim of the law.    For reasons of general policy, a record is held
to import incontrovertible verity, and for the same reason a party is
not permitted to contradict his solemn admission by deed.    And the

same is equally true of legal estoppels by *matter in pais.* Certain acts done out of court and without deed were, by a technical and unyielding rule of law, upheld on like grounds of public policy, and followed always by certain legal consequences. The legal effect of such acts was not permitted to be controverted by proof.

Thus, if one accepts a lease and enters under it, he is estopped to claim any other estate in the land during the term ; he cannot show that he owned the land when the lease was made. Estoppels by *matter in pais* were few in number, and all of this general and well defined character; and they all enforced some technical rule of the law against the truth, and also against the justice and equity of the individual case. COKE, in his examination of the different kinds of estoppel by *matter in pais,* enumerates the following : " By livery, by entry, by acceptance of rent, by partition, and by acceptance of an estate." Co. Lit. 352, *a.* In _ *ion* v. *Reed,* 13 M. & W. 309, PARKE, B., speaking of legal estoppels by *matter in pais,* says,—" They are but few, and are pointed out by Ld. COKE, Co. Lit. 352, *a.* They are all cases which anciently really were, and in contemplation of law have always continued to be, acts of notoriety no less solemn than the execution of a deed, such as livery, acceptance of an estate, and the like. Whether a party had or had not concurred in an act of this sort was deemed a·matter which there could be no difficulty in ascertaining, and then the legal consequences follow."

In the authorities which contain the most complete enumeration of the different kinds of legal estoppels and the fullest discussion of the law on.the subject, I find no allusion to the equitable estoppel which we are now considering. All legal estoppels, whether by record, by deed, or by *matter in pais,* depended on strict legal rules, and shut out proof of the truth and justice of the individual case. Viner's Abr., Estoppel, *passim ; Lyon* v. *Reed,* 13 M. & W. 309 ; *Freeman* v. *Cooke,* 2 Ex. 658.

For this reason, because legal estoppels, whether by record, deed, or *matter in pais,* shut out proof of the truth and justice of individual cases, they have been called *odious,* and have been construed with much strictness against parties that set them up. They were formerly required, like other defences regarded as inequitable, to be pleaded with certainty to a certain intent in every particular. If they were relied on by way of averment and tried by the jury, the jury might find, and according to some authorities were bound by their oath *veritatem dicere* to find, according to the truth of the case regardless of the estoppel. *Trials Per Pais* 284 ; Co. Lit. 227, *a ;* Com. Dig., Estoppel (S. 5). The practice is now different, and legal estoppels may be relied on, when given in evidence, without being specially pleaded. Legal estoppels exclude evidence of the truth and the equity of the particular case to support a strict rule of law, on grounds of public policy.

Equitable estoppels are admitted on the exactly opposite ground of promoting the equity and justice of the individual case by preventing a

party from asserting his rights under a general technical rule of law, when he has so conducted himself that it would be contrary to equity and good conscience for him to allege and prove the truth. The facts upon which equitable estoppels depend are usually proved by oral evidence ; and the evidence should doubtless be carefully scrutinized, and be full and satisfactory, before it should be admitted to estop the party from showing the truth, especially in cases affecting the title to land. But where the facts are clearly proved, the maxim that estoppels are odious,—which was used in reference to legal estoppels, because they shut out the truth and justice of the case,—ought not to be applied to these equitable estoppels, as it has sometimes been, inadvertently as I think, from a supposed analogy with the legal estoppel *by matter in pais*, to which they have, in this respect, no resemblance whatever. Ld. CAMP-BELL, in *Howard* v. *Hudson*, 2 Ellis & Bl. 10 ; *Andrews* v. *Lyons*, 11 Allen 349, 351. In other cases, where more attention has been paid to the real nature of this equitable doctrine, it has been held that such estoppels are not odious, and to be construed strictly, but are entitled to a fair and liberal application, like other equitable doctrines which are admitted to suppress fraud and promote honesty and fair dealing. MELLOR and COMPTON, Justices, in *Ashpitel* v. *Bryan*, 3 Best & Smith 472 ; COWEN, J:, in *Dezell* v. *Odell*, 3 Hill 220 ; *Com.* v. *Motz*, 10 Barr. 530, 531 ; *Buckingham* v. *Hanna*, 2 Ohio St. 557 ; *Van Rensselaer* v. *Kearney*, 11 Howard 326 ; *Preston* v. *Mann*, 25 Conn. 118, 128.

In this equitable estoppel, the party is forbidden to set up his legal title because he has so conducted himself that to do it would be contrary to equity and good conscience. As in other cases of fraud and dishonesty, the circumstances out of which the question may arise are of infinite variety ; and, unless courts at law are willing to abdicate the duty of administering the equitable doctrine effectually in suppression of fraud and dishonesty, the application of it cannot be confined within the limit of any narrow technical definition, such as will relieve courts from looking, as in other cases depending on fraud and dishonesty, to the circumstances of each individual case. Certain general rules will doubtless apply, as in other cases where relief is sought on such grounds. But I find myself unable to agree with the authorities where the old maxim, that legal estoppels are odious, has been applied to this equitable estoppel, and where attempts have been made to lay down strict definitions, such as would defeat the remedy in a large proportion of the cases that fall within the principle on which the doctrine is founded.

The doctrine having been borrowed from equity, courts at law that have adopted it should obviously look to the practice in equity for their guide in the application of it ; and in equity, the doctrine has been liberally applied to suppress fraud and enforce honesty and fair dealing, without any attempt to confine the doctrine within the limits of a strict definition. For instance, the doctrine has not in equity been limited to cases where there was an actual intention to deceive. The cases are numerous where the party who was estopped by his declarations or his conduct to set up his legal title, was ignorant of it

at the time, and of course could have had. no actual intention to de-
ceive by concealing his title.    Yet, if the circumstances were such
that he ought to have informed himself, it has been held to be contrary
to equity and good conscience to set up his title, though he was in fact
ignorant of it when he made the representations.    *Hobbs* v. *Norton,*
*Hunsden* v. *Cheyney, Teasdale* v. *Teasdale, qua supra ;* and *Burrowes* v.
*Lock,* 10 Ves. 470.    So if the party knew the facts, but mistook the
law.    *Storrs* v. *Barker,* 6 Johns. Ch. 166.    Nor is it necessary in equity
that the intention should be to deceive any particular individual or in-
dividuals.    If the representations are such, and made in such circum-
stances, that all persons interested in the subject have the right
to rely on them as true, their truth cannot be denied by the party
that has made them against any one who has trusted to them and acted
on them.    *Gale* v. *Lindo, Farmer* v. *Webber, qua supra.*

In the much and well considered case of *Preston* v. *Mann,* 25 Conn.
118, 128, STORRS, J., delivering the opinion of the court, says,—" The
doctrine of estoppel *in pais,* notwithstanding the great number of cases
which have turned upon it and are reported in the books, cannot be
said even yet to rest upon any determinate legal test which will recon-
cile the decisions, or will embrace all transactions to which the general
principles of equitable necessity wherein it originated demand that it
should be applied.    In fact, it is because it is so peculiarly a doctrine of
practical equity, that its technical application is so difficult, and its re-
duction to the form of abstract formulas is still unaccomplished."
This was said in 1856, and little has since been done towards extricating
the doctrine from the confusion and conflict of authority with which
it was then embarrassed.    This, as I think, has been caused by the fact
that courts have continued to exercise their ingenuity in the vain at-
tempt to compress a broad doctrine of equity within the narrow limits
of a technical definition.

The case of *Pickard* v. *Sears,* 6 Ad. & Ellis 469, decided as late as
1837, appears to have been regarded, both in England and in this coun-
try, as the leading case at law on this subject.    It was trover by the
mortgagee of personal goods against the defendants, who were pur-
chasers at a sheriff's sale on execution against the mortgagor.    The
facts set up in defence were, that the plaintiff was present at the sale,
did not disclose his title as mortgagee, and encouraged the defendants
to purchase.    The question on trial was as to the property of the
plaintiff in the goods, and Ld. DENMAN directed a verdict for the plain-
tiff.    A rule to show cause why the verdict should not be set aside was
made absolute.

In delivering the judgment of the court, Ld. DENMAN said,—" His
[the plaintiff's] title having been established, the property could only be
devested by gift or sale, of which no specific act was even surmised.
But the rule of law is clear, that where one, by his words or conduct,
wilfully causes another to believe the existence of a certain state of
things, and induces him to act on that belief so as to alter his own pre-
vious position, the former in concluded from averring a different state

of things as existing at the same time; and the plaintiff might have parted with his interest in the property by a verbal gift or sale, without any other formalities that threw technical difficulties in the way of legal evidence. And we think his conduct in standing by and giving a kind of sanction to the proceedings under the execution was a fact of such a nature that the opinion of the jury ought to have been taken whether he had not, in point of fact, ceased to be the owner."

It is worthy of note, that in this suit at law the court, so late as 1837, after stating the general equitable doctrine, did not venture to put the defence directly on the ground that the plaintiff was estopped by his conduct to prove the truth of the case, but allowed the facts to go to the jury as evidence that the plaintiff, in some undefined and mysterious way, had parted with his property in the goods : so late and so reluctant were the courts to admit in suits at law this defence, which depended on fraud and dishonesty, and which belonged, originally and appropriately, to the jurisdiction in equity.

It can hardly be supposed that Ld. DENMAN, in the statement which he made of this equitable doctrine in reference to the facts of that case, understood that he was laying down a technical definition fixing the limits of the doctrine, and excluding all cases that did not come clearly within the terms which he used on that occasion. Nevertheless, these remarks of Ld. DENMAN have often being treated as a sort of authoritative text, covering the whole ground, which it was the business of courts in later cases to expound and explain. And it is curious to observe what different and contradictory interpretations have been put on his statement of the equitable doctrine. It has been cited in Massachusetts as authority for decisions, in which it has been held that the representations, to estop the party from showing they were not true, must have been made with the intent to deceive, and the intent to deceive the party who sets up the defence. *Plumer* v. *Lord,* 9 Allen 455 ; *Andrews* v. *Lyons,* 11 Allen 349. And in California the same case has been relied on for the rule that where a representation comes in any way to the ears of a party, who acts on it, the party making the representation is estopped to deny its truth unless it had the character of a confidential communication. *Mitchell* v. *Reed,* 9 Cal. 204. In England it has been treated as a statement of the equitable doctrine made in reference to the circumstances of that case, and not intended as a formal and complete definition. *Freeman* v. *Cooke,* 2 Ex. 654 ; *Gregg* v. *Wells,* 10 A. & E. 90 ; *Jorden* v. *Money,* 5 House of Lords Cases 212.

It would be a laborious and not a profitable task to attempt an analysis of all the recent decisions on this subject. I will briefly advert to some of those which appear to be the most important.

In *Plumer* v. *Lord,* 9 Allen 455, it was held that to create an estoppel *in pais,* the declarations or acts must have been accompanied with a design to mislead ; and *Langdon* v. *Doud,* 10 Allen 433, is to the same point. In *Andrews* v. *Lyons,* 11 Allen 349, the court went one step further, and decided that the declarations or acts must have been

accompanied with a design to deceive the party who sets up the estoppel, and induce him to act on them ; and in this last case it is said that such an estoppel shuts out the truth, and is odious, and must be strictly proved.   In *Hawes* v. *Marchant*, 1 Curtis C. C. 144, the rule is laid down that to be estopped the party must have designedly made admissions inconsistent with the defence or claim which he proposes to set up, and another, with his knowledge and *consent*, so acted on this admission that he will be injured by allowing the admission to be disputed ; and this rule is cited and apparently approved in *Audenried* v. *Betteley*, 5 Allen 382.

In these cases, it is to be observed, the court have not been content with saying, in reference to the facts before them, that if certain things concurred in the case it would fall  within the equitable doctrine and the party would be estopped, but they have undertaken to lay down a strict legal definition of general application, excluding from the operation of the doctrine all cases that do not fall within the terms of the definition.    Applying the rule, as laid down in *Hawes* v. *Marchant*, to the present case : if Horn had known that Cole had a demand against Charles E. Horn, had falsely represented to Cole that the goods belonged to Charles with the design to deceive him and induce him to attach the goods as the property of Charles, and Cole, relying on the representation, had taken the goods as the property of Charles and as Horn intended, yet, if after he had made the false representation he did not know that the goods were taken as the property of Charles, and assent that they should be so taken, he would not be estopped to set up his own title in the goods.    The statement that another party must have acted on the false statement with his *knowledge and assent* must mean this, or it can mean nothing ; for he could not know that he had acted on it at all until the act was done and accomplished.

The remark of Lord CAMPBELL in *Howard* v. *Hudson*, *qua supra*, though not called for by the case, is to the effect that the representation must have been intended to deceive.

These authorities would seem to sustain the plaintiff's counsel fully in his position that the false representation must not only be intended to deceive, but also to deceive the identical party that acted on them.

There are, however, authorities of equal respectability, and in greater numbers, which maintain a different doctrine.

In England, the case of *Pickard* v. *Sears* does not appear to have been understood as intended to lay down a complete definition of the equitable doctrine excluding all cases that could not be brought within the terms of the remarks made by Lord DENMAN.   In *Freeman* v. *Cooke*, 2 Ex. 654, it was held that the term *wilfully*, used in *Pickard* v. *Sears*, was not to be understood in the sense of *maliciously ;* and that whatever a man's real meaning may be, if he so conducts himself that a reasonable man would take the representation to be true, and believe it was meant he should act on it, and he did act on it as true, the party making the representation would be equally precluded from contesting its truth.    This is wholly inconsistent with the notion that an inten-

tion to deceive is an essential ingredient of the representation, which precludes the party making it from showing that it was false. So in *Jorden* v. *Money*, 5 House of Lords Cases 212, it was held not to be necessary that the party making the representations should know that they were false; that no fraud need have been intended at the time; but if the party *unwittingly* mislead another, you must add that he has misled him under such circumstances that he had reasonable ground for supposing that the person whom he was misleading would act upon what he was saying.

In *Gregy* v. *Wells*, 10 A. & E. 90, Lord DENMAN says,—"*Pickard* v. *Sears* was in my mind at the time of the trial, and the principle of that case may be stated even more broadly than it is there laid down. A party who *negligently* or culpably stands by and allows another to contract on the faith and understanding of a fact which he can contradict, cannot afterwards dispute that fact in the action against the person whom he has himself assisted in deceiving." This shows that Ld. DENMAN did not himself understand that his remarks in *Pickard* v. *Sears* were to be taken as a definition and limitation of the equitable doctrine, for he says the principle of the case might be stated more broadly than it is laid down there, and may include the case of a culpable negligence. So *Hobbs* v. *Norton*, 1 Vernon 136, *Hunsden* v. *Cheyney*, 2 Vernon 150, *Teasdale* v. *Teasdale*, 13 Viner 539, *Burrowes* v. *Lock*, 10 Ves. 475, before cited, show that the practice in equity does not require that there should in all cases be an intention to deceive, or even a knowledge that the representation was false.

We come now to the decisions in this country, which give a broader application to this doctrine than those before cited.

In *Dezell* v. *Odell*, 3 Hill 221, the general doctrine is said to be that when a party, either by his declarations or his conduct, has influenced a third person to act in a particular manner, he will not be afterwards permitted to deny the truth of the admission if the consequence would be to work an injury to such third person; and that in such case it must appear, first, that he made an admission which is clearly inconsistent with the evidence he proposes to give, or the claim which he proposes to set up; second, that the party has acted on the admission; third, that he will be injured by allowing the truth of the admission to be disputed. According to this interpretation of the equitable doctrine, it would seem not to be necessary that the representation should be intended to deceive, or that the party making it should know it to be false, or that it should be intended the party should act on it, who does so in fact, and is deceived by it. The rule of this case has been adopted and followed in *Newman* v. *Hook*, 37 Mis. 207 ; *Carpenter* v. *Stillwell*, 12 Barb. 135, and *Eldred* v. *Hazlett*, 33 Penn. St. 316.

In *Roe* v. *Jerome*, 18 Conn. 138, the general doctrine is stated to be, that where one person by his words or conduct causes another to believe in a certain state of things, and thus induces him to act on that belief so as injuriously to affect his previous position, he is concluded from averring a different state of things as existing at the time ; and

this rule was followed in the later cases of *Cowles* v. *Bacon*, 21 Conn. 451, and *Dyer* v. *Cady*, 20 Conn. 563 ; and in *Preston* v. *Mann*, 25 Conn. 118, before cited, it is said that the doctrine did not then rest on any determinate legal test which will embrace all transactions to which the general principles of equity, in which it originated, demand that it should be applied.

*Buchanan* v. *Moore*, 13 S. & R. 304, 306, is to the point that though the party believed his representation to be true, and made it under a mistake, he is estopped to show that he made the representation inno-cently believing it to be true, provided the other party acted on it, and had reason to act on it, as true.    So in *Strong* v. *Ellsworth*, 26 Vt. 366, it is said by REDFIELD, C. J., that he who by his words or actions, or his silence even, intentionally or *carelessly* induces another to do an act which he would not otherwise have done, and which will prove in-jurious to him if he is not allowed to insist on the fulfilment, may in-sist on such fulfilment, and that the doctrine of equitable estoppels lies at the foundation of morals.    In *Mitchell* v. *Reed*, 9 Cal. 204, it was held that where a statement made to a third person is not confidential, but general, and is acted on by others, the party making the declara-tion is estopped to deny its truth ; that the intention with which the declaration is made is not material, except, perhaps, where it is confi-dential.    This case, and *Quirk* v. *Thomas*, 6 Mich. 76, are authorities that to work the estoppel it is not necessary the declaration should be made to the party who acts on it, nor in his presence, nor that the dec-laration should be intended to come to the knowledge of any particular person.

In a suit at law to recover damages for a false affirmation that the signer of a note was of age, it was decided, in *Lobdell* v. *Baker*, 1 Met. 193, that it was not necessary to allege or prove that the defendant knew the signer was an infant.    WILDE, J., in delivering the opinion of the court, said,—" A party may render himself liable in an action for damages to a party prejudiced by a false affirmation, though not made with any fraudulent intention."    This, it may be said, is not directly in point, but the only difference is in the form of the remedy.    The prin-ciple involved is the same, whether the question is raised in a suit to· recover damages for the false representation, or redress is sought by estopping the party to prove the falsehood of the representation.    Both cases go on the same general ground, that the party is responsible for the consequences of his false representation.

There are numerous authorities that it is not necessary to the estop-pel that the declarations or conduct should be intended to deceive any particular person or persons ; that if they were intended to deceive generally, or were of such a character and made in such circumstances that it must have been understood they were likely to deceive, and any person using due diligence was in fact deceived by them, it is enough. *Gregg* v. *Wells*, 10 A. & E. 90 ; *Wendell* v. *Van Rensselaer*, 1 Johns. Ch. 353 ; *Adams County* v. *Brown*, 16 Ohio St. 78 ; *Dezell* v. *Odell*, 3 Hill 221 ; *Quirk* v. *Thomas*, 6 Mich. 76 ; *Mitchell* v. *Reed*, 9 Cal. 204.

It has been declared in many cases that this equitable estoppel involves a question of legal ethics, and applies wherever a party has made a representation, by words or conduct, which he cannot in equity and good conscience prove to be false ; and that this kind of estoppel, being a broad doctrine of equity, cannot be limited in application by the terms of any narrow legal definition. In the _Canal Co._ v. _Hathaway_, 8 Wend. 483, it is said by SUTHERLAND, J., that the party is estopped when in good conscience and equity he ought not to be permitted to gainsay his admission ; and in the same case, by NELSON, J., " from the means in which the party must avail himself of these estoppels, it is obvious there can be no fixed and settled rules of universal application." And in _Dezell_ v. _Odell_, 3 Hill 225, BRONSON, J., adopting the language of NELSON, J., in the _Canal Co._ v. _Hathaway_, adds,—" It is a question of ethics." In _Strong_ v. _Ellsworth_, 26 Vt., REDFIELD, J., says the doctrine lies at the foundation of morals. In _Lucas_ v. _Hart_, 5 Iowa 415, the court hold that " in these estoppels there can be no fixed and settled rules of convenient application to regulate them as in technical legal estoppels ; that in many, and probably in most instances, whether the act or admission shall operate as an estoppel or not must depend on the circumstances of the case, though there are some general rules which may materially assist in the examination of such cases." In the application of these general rules to that case, the court decided that the acts and admissions of the respondent estopped him from asserting his title to the property in question ; that to permit him to do it would be " unconscionable, and contrary to that fairness and honest dealing which courts of equity seek ever to promote and encourage."

In _Frost_ v. _The Saratoga Co._, 5 Denio 154, it is said by BEARDSLEY, C. J., that such an estoppel is a question of ethics, and is allowed to prevent fraud and injustice, and exists wherever a party cannot in good conscience gainsay his own acts or assertions. The case of _Preston_ v. _Mann_, 25 Conn. 118, is strong to the point that this estoppel, depending on a broad doctrine of equity, cannot be governed in application by narrow and strict rules of construction, such as have prevailed in legal estoppels.

In some if not in most of the cases, in which it is said that if a party makes representations intending to deceive the party that acts on them, the equitable estoppel applies, it was not intended, as I think, to lay down a rule excluding all cases that did not fall within the statement made in reference to the facts of the case then under consideration ; that what is said is not to be taken as a rule to limit and define the doctrine and exclude all other cases. They say, if such and such things concur, _this case_ will fall within the doctrine ; but they do not intend to say no other cases are within it. For example, in _Kinney_ v. _Farnsworth_, 17 Conn. 361, STORRS, J., says that " admissions which have been the means, _designedly_, of leading others to a particular course of conduct, cannot afterwards be conscientiously retracted by one who has made them." He could not have intended to lay down the rule

that one would in no case be estopped by a representation not *designed* to deceive, because the same judge, in *Preston* v. *Mann*, says,—" The doctrine is not reduced to the limits of any formula," and " whatever the *motive* may be, if one so acts or speaks that the natural consequence of his words or conduct will be to influence another to change his condition, he is legally charged with the intent to induce the other to believe and to act on that belief, if such proves to be the result." So Ld. DENMAN, speaking, in *Gregg* v. *Wells*, 10 A. & E. 90, of his judgment in *Pickard* v. *Sears*, says,—" The principle of that case may be stated even more broadly than it is there laid down."

In this State we have several cases where the general question has been more or less considered. In *Wells* v. *Pierce*, 27 N. H. 503, the doctrine of equitable estoppel was traced to its origin in equity, and it was held that if the owner actively encourages the purchase of his property from another, he will be precluded from claiming it, though he was not aware of his interest at the time; which is clearly in conflict with the notion that the representation must be accompanied with an intention to deceive. In *Davis* v. *Handy*, 37 N. H. 65, the doctrine of *Wells* v. *Pierce* was approved and applied. In the recent case of *Drew* v. *Kimball*, 43 N. H. 285, one point directly involved was, whether it was necessary that the party to be estopped should intend to deceive and defraud the individual to whom the representation was made, and who set up the defence; and it was held that it was not necessary. Indeed, it seems to me that it would be trifling with a doctrine depending on equity and good conscience to hold otherwise. So, if a representation was intended to deceive one man, and it in fact deceived and defrauded another. Then, again, if the representation were intended to have one operation, and, as it turned out, deceived and defrauded by another method not contemplated by the party at the time, but still the natural consequence of the representation, it would be quibbling with a doctrine depending for its application on the morality of the act to hold that the party would not be answerable for the consequences of his false and fraudulent representation as much as if it had taken effect on the party and in the manner intended. In a case depending on a question of " legal ethics," it would bring down the morality of the law to a very low standard to hold that a party was not liable for the wrong caused by his fraud to one man, because the fraud was contrived against another man.

In *Drew* v. *Kimball* the case did not r͏·ᷧ the precise point taken in this case. But, on a full discussion of the general doctrine and a review of the authorities, the court, adopting the hypothetical case put by PARKE, B., in *Freeman* v. *Cooke*, say,—" If, whatever a man's intentions may be, he so conducts himself that a reasonable man would take the representation to be true, and believe it was meant he should act upon it, and he did act upon it as true, the party making the representation would be equally precluded from contesting its truth. In short, the representations are to be regarded as *wilful* when the person making them means them to be acted on, or if, without regard to intention, he

so conducts himself that a reasonable man would take the representation to be true, and believe it was meant he should act on it."

There have been several other cases in this State where this equitable doctrine has been considered and applied.   *Thompson* v. *Sanborn,* 11 N. H. 201; *Simons* v. *Steele,* 36 N. H. 73; *McMahon* v. *Portsmouth Ins. Co.,* 22 N. H. 15; *Odlin* v. *Gove,* 41 N. H. 473; *Corbett* v. *Norcross,* 35 N. H. 99, 115 ; *Richardson* v. *Chickering,* 41 N. H. 380, 385. Though I do not find that the precise point taken here for the plaintiff has been directly decided in any of our cases, yet the general current of our decisions on the subject tends to a liberal application of the doctrine for the suppression of fraud and dishonesty, and the promotion of justice and fair dealing. No disposition has been shown in the courts of this State to treat this equitable estoppel as odious, and embarrass its application by attempts to confine it within the limits of a narrow technical definition.    We are content to follow where the spirit and general tone of these decisions lead : and they lead plainly to the conclusion, that, where a man makes a statement disclaiming his title to property, in a manner and under circumstances such as he must understand those who heard the statement would believe to be true, and, if they had an interest in the subject, would act on as true, and one, using his own means of knowledge with due diligence, acts on the statement as true, the party who makes the statement cannot show that his representation was false to the injury of the party who believed it to be true and. acted on it as such ; that he will be liable for the natural consequences of his representation, and cannot be heard to say that the party actually injured was not the one he meant to deceive, or, that his fraud did not take effect in the manner he intended.

Our conclusion is, that, on the facts which the verdict has established, the plaintiff was estopped to show his representation that the goods belonged to Charles E. Horn to be false, though he did not know that the defendant Cole had any demand against Charles E. Horn, and though he had not Cole in his mind as the party whom he meant to deceive.

*Judgment on the verdict.*